ORIGINAL

CUNEO GILBERT & LADUCA LLP
Michael J. Flannery (SB No. 196266)
7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
Telephone: (202) 789-3960
mflannery@cuneolaw.com

CUNEO GILBERT & LADUCA LLP
Charles J. LaDuca
Matthew E. Miller
charlesl@cuneolaw.com,
mmiller@cuneolaw.com
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960

FILED

FEB 13 2017

CLE.·K US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* BRIAN J. ZOTTI,<br><br>  Plaintiff<br><br> v.<br><br> BRIDGEPOINT EDUCATION, INC. and ASHFORD UNIVERSITY, LLC<br><br>  Defendants | Civil Action No. 17-cv-0035-JAH-JMA<br><br> **CORRECTED COMPLAINT** |

**FILED IN CAMERA AND
UNDER SEAL**

**DO NOT ENTER IN PACER**

*Qui Tam* Plaintiff Brian J. Zotti, through his attorneys, on behalf of the United States of America, for his Complaint against the defendants identified below (the "Defendants"), alleges, based upon his personal knowledge, and relevant documents, as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730. The Court has jurisdiction of those state law claims asserted herein pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because the Defendants have their principal places of business in this district, Defendants can be found in and transact or have transacted business in this district, and many of the fraudulent acts alleged herein were directed to this district.

## PARTIES

3. Plaintiff Brian J. Zotti ("Plaintiff" or "Relator") is a *Qui Tam* Plaintiff/Relator in this action and is a resident of Georgia.

4. Defendant Ashford University, LLC ("Ashford" or "AU") is a California limited liability company with its principal place of business in San Diego, California. Ashford is a for-profit higher education institution providing educational programs The bulk of Ashford's revenue arises from its online program (founded in San Diego, California). Ashford is accredited by the WASC Senior College and University Commission ("WSCUC") Ashford offers certificate programs, as well as undergraduate and graduate degree programs. Ashford is a wholly owned subsidiary of Bridgepoint Education, Inc. ("BPI" or "Bridgepoint"). Bridgepoint purchased the Franciscan University of the Prairies, then a non-profit campus only college in Iowa, in March 2005, renamed it Ashford University, and

1  converted it into a for-profit and primarily online institution

2      5.    Defendant Bridgepoint, founded in 2004, is a Delaware corporation

3  with its principal place of business in San Diego, California. Bridgepoint is a

4  publicly traded company that derives its revenues and income from Ashford and the

5  University of the Rockies (another for profit educational institution). Bridgepoint

6  controls the operations of Ashford, its wholly owned subsidiary.

7                    **FEDERAL STATUTORY BACKGROUND**

8  **A. The Federal False Claims Act**

9      6.    The false claims provision of the False Claims Act (the "FCA"), at 31

10 U.S.C. § 3729(a)(1)(A), provides in pertinent part that any person who "knowingly

11 presents, or causes to be presented, a false or fraudulent claim for payment or

12 approval" shall be liable to the United States Government.

13     7.    Plaintiff alleges that, from at least 2012 through 2015, Defendants

14 violated the FCA by knowingly submitting and/or causing the submission of false

15 claims for payment to the Department of Education ("DOE") in the form of Free

16 Applications for Federal Student Aid ("FAFSA") and the resulting drawdowns of

17 Title IV funds related to each approved FAFSA. These claims for payment were

18 false because Ashford: (1) made knowingly false statements and promises in its

19 program participation agreements ("PPAs"), and in certifications accompanying its

20 drawdowns of federal aid, that it was complying with, and would continue to

21 comply with, applicable laws and regulations governing the award of Title IV

22 funding; and/or (2) made, or caused to be made, false representations in grant and

23 loan applications that the students seeking federal financial aid were eligible to

24 receive such aid.

25     8.    The FCA, as amended by the Fraud Enforcement and Recovery Act of

26 2009 (FERA), Pub. L. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009), provides in

27 pertinent part that a person is liable to the United States government for three times

28 the amount of damages the government sustains because of the act of that person,

1  plus a civil penalty, for each instance in which the person "knowingly presents, or

2  causes to be presented, a false or fraudulent claim for payment or approval." 31

3  U.S.C. § 3729(a)(l)(A) (2009).

4       9.     As amended by FERA, the FCA also makes a person liable to the

5  United States government for three times the amount of damages which the

6  government sustains because of the act of that person, plus a civil penalty, for each

7  instance in which the person "knowingly makes, uses, or causes to be made or used,

8  a false record or statement material to a false or fraudulent claim." 31 U.S.C. §

9  3729(a)(1)(B) (2009).

10 **B. Title IV of The Higher Education Act of 1965**

11      **1.     Eligibility for Programs**

12      10.    Under Title IV of the Higher Education Act of 1965 ("HEA"), 20

13 U.S.C. §§ 1070 et seq., Congress established various student loan and grant

14 programs, including but not limited to the Federal Pell Grant Program ("Pell"), and

15 the Federal Direct Loan Program ("FDLP") (collectively "Title IV Funding") in

16 order to financially assist eligible students in obtaining a post-secondary education.

17      11.    Although the mechanism by which Title IV funding is disbursed to

18 eligible students under the Title IV, HEA programs varies, each Title IV, HEA

19 program requires compliance with specific conditions as a prerequisite to obtaining

20 federal funds.

21      12.    In order to become eligible to receive Title IV funding under programs

22 such as Pell or FDLP, or to have its students receive Title IV funding, a post-

23 secondary educational institution must first enter into a PPAA with the DOE. 20

24 U.S.C. § 1094; 34 C.F.R. §668.14.  Each PPA expressly conditions a school's

25 initial and continuing eligibility to receive funds under Title IV, HEA programs on

26 compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34

27 C.F.R. § 668.14.

28      13.    To participate in Title IV programs, a school must maintain

1  authorization by the state education agency or agencies where it is physically
2  located, be accredited by an accrediting agency recognized by DOE and be certified
3  by DOE as an eligible institution. Institutions that participate in the Title IV
4  programs are subject to an extensive set of laws and regulations. The laws,
5  regulations and standards of WSCUC, DOE and state agencies affect the vast
6  majority of our institutions' operations.

7  14.    The HEA prohibits an institution participating in Title IV programs
8  from engaging in substantial misrepresentation of the nature of its educational
9  programs, financial charges or graduate employability.  34 CFR § 668.71(a) .
10 Under DOE's rules, a "misrepresentation" is any false, erroneous or misleading
11 statement an institution, one of its representatives, or any ineligible institution,
12 organization, or person with whom the institution has an agreement to provide
13 educational programs, or marketing, advertising, recruiting, or admissions services
14 makes directly to a *student or prospective student* or any member of the public, or
15 to *an accrediting agency*, a state agency or *the Department*.   34 CFR § 668.71(c)
16 (emphasis added).  The DOE's rules define a "substantial misrepresentation" as any
17 misrepresentation on which the person to whom it was made could reasonably be
18 expected to rely, or has reasonably relied, to that person's detriment.  *Id.*

19 15.    In order to maintain its eligibility to receive Title IV funding, each
20 year an educational institution that participates in any Title IV, HEA program also
21 must provide the DOE with an annual compliance audit of its administration of
22 Title IV, HEA programs, and an audit of the institution's general purpose financial
23 statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R.
24 §§ 668.23 (a)(2) & (a)(4). For-profit educational institutions, such as Ashford, must
25 conduct their annual financial statements and compliance audits in accordance with
26 the Department of Education Office of Inspector General's Audit Guide ("DOE
27 Audit Guide"). The DOE uses the results of the compliance and financial audits to
28 determine whether schools are adhering to applicable requirements for Title IV

CORRECTED COMPLAINT                    - 4 -

funding. As part of the annual audits, Ashford is required to certify, in the form of written "Required Management Assertions," that, among other things, it complies with the requirements for eligibility to participate in Title IV programs. DOE Audit Guide, at p. II-3.

**2. Title IV Programs**

16. After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made. Under Pell and FDLP, students submit requests for funding directly to the DOE, or to the DOE with the assistance of schools.

17. With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered.

18. For all Title IV, HEA programs, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA." the student initiates the process by submitting a FAFSA to the DOE to have the student's expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell funds. 34 C.F.R.§ 690.12(a).

19. For a student to be eligible for a HEA program, the student must, *inter alia*, "[m]aintain[] satisfactory academic progress in his or her course of study according to the institution's published standards of satisfactory academic progress that meet the requirements of § 668.34." 34 C.F.R. § 668.32(f).

20. There are limits on how much a student can borrow. The limit for lifetime undergraduate borrowing by independent students is $57,500, up to $23,500 of which may be subsidized loans. The lifetime limit for combined undergraduate and graduate borrowing by independent students is $138,500, no more than $65,000 of which may be subsidized. 34 C.F.R. § 682.204.

21. The student either sends the FAFSA directly to the DOE or provides it

to a school for the school to transmit to the DOE on the student's behalf. 34 C.F.R.§ 690.12(b).

22. The DOE sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. § 690.13.

23. The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower. The financial aid package may include Pell Grants, FDL Program Direct Loans, or Campus-Based Aid (which, in turn, includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

24. The student can accept all or part of the financial aid award package.

25. If the student accepts a Pell Grant, an FDL Program Direct Loan (for which the DOE is both lender and guarantor), or both a Pell Grant and a Direct Loan, the school creates an electronic "origination" record that the school submits to a DOE computerized database called "COD" - the Common Origination and Disbursement system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another DOE database, called "CPS," the Central Processing System, which compares the information in the origination record to the information on the student's SAR and ISIR.

26. Provided that the information submitted by the school is consistent with the information possessed by the DOE, the DOE makes funds available for the school to electronically draw down from a computerized system known as "G5."

27. Schools must electronically certify in G5 prior to drawing down the

funds that "by processing this payment request...the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."

### a. Pell Grants

28. Under the Pell Grant program, the DOE provides federal funds to assist postsecondary school students in financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1.

29. In addition to the Pell Grants themselves, the DOE also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA federal student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

### b. Direct Loans

30. The FDL Program is administered by the Office of Federal Student Aid. Under the FDL Program, the federal government is the lender, and does not pay subsidies to private lenders or guaranty agencies. The federal government borrows funds from the U.S. Treasury and disburses the loan directly to the student at his or her school. The student repays the loan directly to the government. Although the FDL Program is administered in part by the DOE, the federal government pays private contractors to handle most of the loan servicing tasks and defaulted loan collections. Servicing contracts are awarded through a competitive bidding process.

31. In order to participate in any Title IV loan program, as opposed to a grant program, a student completes a Master Promissory Note (MPN) and submits the MPN to the educational institution. The institution, in turn, completes a "School Certification," in which it certifies the accuracy of the information it provided to the DOE and the student's eligibility for the loan. 34 C.F.R. § 682.102. While the MPN itself is valid for ten years, the educational institution determines the student's

ongoing eligibility for aid and completes the School Certification annually.

32. The FDL Program includes Direct Subsidized Stafford Loans, Direct Unsubsidized Stafford Loans, Direct PLUS Loans, and Direct Consolidation Loans. Stafford Loans are only available for undergraduate students. PLUS loans are also available to graduate and professional students, as well as parents of dependent undergraduate students. To be eligible for a PLUS loan, a student must be enrolled at least half-time in a graduate or professional program (for example, a program that leads to a Master's Degree or to a law or medical degree) at a school that participates in the FDL Program.

33. For subsidized Stafford Loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

34. Direct Unsubsidized Loans are not based on financial need, and are available to students who do not qualify for a Direct Subsidized Loan, or in some cases, in addition to a Direct Subsidized Loan.

35. In the event of default on the loan, DOE pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R.§ 682.404.

36. FDL Loan funds are paid to Ashford and other institutions, which in turn credit the student's account for tuition and fees and disburse any amounts in excess of tuition and fees to the student.

## ASHFORD'S PARTICIPATION IN TITLE IV, HEA PROGRAMS

### A. Ashford's Submission of Program Participation Agreements to DOE

37. Ashford signed and submitted PPAs to the DOE.

38. The PPAs state with emphasis in bold letters on the first page of the

PPAs in a double-lined box that:

> **The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program.**

(emphasis in original).

39. By signing the PPAs, Ashford certified that it would comply with Title IV of the HEA's requirements. In the first enumerated paragraph of each PPA, all of the PPAs signed on Ashford's behalf, state:

> 1. The Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV, HEA program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 CFR Part 668. *The recitation of any portion of the statute or regulations in this Agreement does not limit the Institution's obligation to comply with other applicable statutes and regulations.*

(emphasis in original).

40. Ashford also certified in each PPA that:

> By entering into this Program Participation Agreement, the Institution agrees that:
> (1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program;

41. As described in greater detail below, Defendants knowingly made false statements, certifications, and claims regarding Ashford's compliance with DOE regulations and the terms of its PPAs. In order to secure greater federal funding, beginning in at least 2013, Ashford was violating federal regulations by, among other things, (1) making misrepresentations to accreditation authorities, and the investing public, concerning the proportion of its expenses attributable to admissions and marketing, as opposed to instruction, (2) steering students with

unpaid undergraduate tuition balances into graduate programs and allocating proceeds designated for graduate loans to undergraduate tuition balances, which is contrary to Ashford's own policies and representations made to DOE concerning the purpose of graduate loans, (3) making material misrepresentations and engaging in other deceptive practices (a) to guide prospective students into academic programs that suit Ashford's financial needs rather than the needs of the student, and (b) to coerce students to continue to remain registered for courses when they have no possibility of passing them or it would otherwise be in their best interests to discontinue, and (4) making material misrepresentations to investors in late 2014 and early 2015 concerning Ashford's enrollment, which data and analyses available to the Defendants indicated was declining and would continue to decline.

42.     Ashford nevertheless executed the PPAs and agreed that Ashford would comply with applicable federal regulations and the terms of the PPAs. Ashford then drew down federal grant funds and again stated that the funds were being used in accordance with the conditions of the PPAs. Ashford's statements were false when made, and caused the DOE to pay various claims under Title IV, HEA Programs that it would not have paid but for Ashford's fraud.

**B. Federal Funds Received from the DOE**

43.     Ashford has received substantial sums in Title IV funding from DOE as a result of Defendants' fraudulent conduct.

44.     During the period January 1, 2010 through December 31, 2015, as reflected on the Reports on Form 10-K filed by BPI with the Securities & Exchange Commission, Ashford reported that it received approximately $3.8 billion in Title IV funds for students enrolled at its physical and online campuses as follows:

| Year | Gross Revenues[1] | % Title IV | Revenues from Title IV |
|---|---|---|---|
| 2010 | $683,096,544.00 | 85.00% | $586,779,931.30 |
| 2011 | $895,111,566.00 | 86.80% | $760,844,831.10 |
| 2012 | $919,819,875.00 | 86.40% | $803,002,750.88 |
| 2013 | $728,154,081.00 | 85.60% | $637,862,974.96 |
| 2014 | $619,543,850.00 | 83.40% | $547,057,219.55 |
| 2015 | $546,000,588.00 | 80.90% | $472,836,509.21 |
|  |  |  |  |
|  | $4,391,726,504.00 |  | $3,808,384,216.99 |

# DEFENDANTS' FRAUDULENT SCHEME

## A. Misrepresentations to WSUSC and Investors About the Proportion of Expenses Spent on Instruction

45.     Accreditation is a private, non-governmental process for evaluating the quality of an educational institution and its programs and an institution's effectiveness in carrying out its mission in areas including integrity, student performance, curriculum, educational effectiveness, faculty, physical resources, administrative capability and resources, financial stability and governance. To be recognized by DOE, an accrediting agency, among other things, must adopt specific standards to be maintained by educational institutions, conduct peer-review evaluations of institutions' compliance with those standards, monitor compliance through periodic institutional reporting and the periodic renewal process and publicly designate those institutions that meet the agency's criteria. An accredited institution is subject to periodic review by its accrediting agency to determine whether it continues to meet the performance, integrity, quality and other standards required for accreditation. An institution that is determined not to meet the standards of accreditation may have its accreditation revoked or not renewed.

46.     From 1950 until [being institutionally accredited by WSCUC in December 2013], Ashford University was accredited by Higher Learning

---

[1] BPI does not disclose Ashford's revenues independently of BPI's. Figures projected based on Ashford's percentage of BPI's aggregate student enrollment.

CORRECTED COMPLAINT                    - 11 -

1 Commission of the North Central Association of Colleges and Schools ("HLC").

2 Ashford maintains a small physical campus in Clinton, Iowa, which, if considered

3 to be its "main campus," would have placed it within HLC's region.

4    47.    HLC adopted a bylaw in 2010 and policies adopted in 2011 and 2012,

5 that require all institutions accredited by the HLC to have a majority of their

6 educational administration and activities, business operations and leadership located

7 "substantially in the 19-state north central region." The effective date for the bylaw

8 for currently accredited institutions was July 1, 2012.

9    48.    In early 2010, Ashford University informed the HLC of its intention to

10 seek accreditation by the WSCUC, the regional accrediting agency that covers

11 institutions based in California. In connection with its transition to WSCUC

12 accreditation, Ashford University designated its San Diego, California facilities as

13 its main campus for Title IV purposes . On June 25, 2010, the HLC sent a reminder

14 to Ashford regarding the jurisdictional requirement and gave Ashford until

15 December 1, 2012, to demonstrate compliance with this requirement.

16    49.    On March 11-16, 2012, a WSCUC team visited Ashford.

17    50.    On June 15, 2012, the WSCUC board denied Ashford's application for

18 initial accreditation. (The action was made public on July 9, 2012.)

19    51.    In its visitation report, WSCUC expressed concern about the

20 disproportionately large share of Ashford's budget spent on recruitment and

21 enrollment, as opposed to instructional costs and student services:

22    The University's spending patterns and evidence of alignment of revenues
with educational purposes and objectives are a concern. Related to the issues
23    of fiscal control is a more important concern to the team, that of the history
of allocation decisions and the relative underfunding of the academic
24    program compared to an emphasis on student recruitment and enrollment –
and revenue – growth. Spending on student recruitment constitutes over 31%
25    of Ashford spending, well above spending for instructional costs and
services, which in the case of Ashford includes both direct spending on
26    faculty and the administration of financial aid, student services and academic
support.

27

28

1    52.    Investors and securities analysts are also well aware of the importance

2    of Ashford having a relatively low ratio of marketing and admissions to

3    instructional expenses as a percent of revenue, and, specifically, the fact that the

4    ratio matters to accrediting authorities. They understand that, if the ratio becomes

5    imbalanced, it threatens the continued accreditation of Ashford, which, in turn, is a

6    threat to Ashford's ability to continue to do business. Because of the importance of

7    Ashford's expense ratios, they were discussed regularly during quarterly conference

8    calls with investment professionals.

9    53.    Following the 2012 denial of accreditation by the WSCUC, Ashford

10   claimed to take steps to shift spending from admissions to instruction.

11   54.    Ashford University claimed, in its filings with the SEC, to have "made

12   many changes to its operations and business initiatives throughout 2012 and 2013

13   as part of its reapplication for initial accreditation from" WSCUC. In its Report on

14   Form 10-K for the period ending December 31, 2013, Ashford reported the

15   following changes:

16   Our instructional costs and services for 2013 were $370.7 million, an
     increase of $27.7 million, or 8.1%, as compared to $343.1 million for 2012.
17   In the second half of 2012, the Company began to increase its instructional
     costs and services costs in direct response to WSCUC accreditation efforts.
18   These additional costs and services included hiring new leadership,
     implementing smaller class sizes, hiring additional full-time faculty and
19   implementing new program review models. The Company continued these
     efforts and related changes to the cost structure throughout 2013. These
20   increases were partially offset by decreases in enrollment. Student enrollment
     at our academic institutions decreased by 22.2% from 81,810 to 63,624 as of
21   December 31, 2012 and 2013, respectively. The average weekly enrollment
     during fiscal year 2013 also decreased to 72,500 from 90,838, or by 20.2%,
22   over the same period in the prior year. Specific increases between periods
     include increases in corporate support services of $20.7 million, direct
23   compensation in the areas of academic management, financial aid support
     and student services of $17.6 million (including $4.8 million of severance
24   charges from the second quarter of 2013), facilities costs of $6.5 million,
     loan impairment of $2.0 million and amortization of $1.7 million. These
25   increases were offset by decreases in instructor fees of $9.6 million, bad debt
     expense of $5.7 million, and financial aid processing fees of $3.0 million.
26   Instructional costs and services increased, as a percentage of revenue, to
     49.3% for 2013, as compared to 36.4% for 2012, primarily as a result of the
27   decreased revenue. The increase of 12.9% as a percentage of revenue
     included increases in direct compensation of 5.1%, corporate support
28   services of 3.3%, facilities costs of 1.6%, information technology costs of

0.8%, bad debt expense of 0.7%, instructor fees of 0.3%, loan impairment of 0.3% and amortization of 0.3%. As a percentage of revenue, bad debt expense was 6.3% for 2013, compared to 5.6% for 2012. Although we resolved the accounts receivable aging issue, which resulted in the revision of bad debt for fiscal year 2012, we continued to be indirectly impacted within fiscal year 2013. As a result of the prior aging issue and the prior financial aid packaging issues, a backlog of work resulted for our financial aid and collections departments. Due to this backlog, the ability to package or collect prospective accounts throughout 2013 was reduced and resulted in higher bad debt. Additionally, due to the timing of the aging issue, in certain cases this resulted in the inability to package students timely in the first half of 2013. Lastly, we had reductions in our collections department workforce, which also resulted in higher bad debt. Although we cannot be certain that these changes will decrease bad debt expense in the future, we continue to focus on enhancing our processes and procedures around our accounts receivable, including improvements and efficiencies in financial aid processing in order to reduce the processing timeline, improved collection efforts on accounts receivable, and improved counseling to students about the financial aid process and related eligibility and amounts due from the student.

*Admissions advisory and marketing.* Our admissions advisory and marketing expenses for 2013 were $235.4 million, a decrease of $103.9 million, or 30.6%, as compared to $339.2 million for 2012. Specific factors contributing to the overall decrease between periods were decreases in related compensation of $39.5 million due to fewer admissions and related personnel, advertising costs of $27.2 million, corporate support services of $25.1 million, facilities costs of $5.6 million, and information technology costs of $5.4 million. Our admissions advisory and marketing expenses, as a percentage of revenue, decreased to 31.3% for 2013 from 36.0% for 2012. The decrease of 4.7% as a percentage of revenue was primarily due to the decreases in corporate support services of 3.0%, selling compensation of 1.0%, and advertising costs of 0.8%.

55.     These efforts to convince WSCUC that Ashford had shifted its spending towards instruction were successful in achieving the objective of causing WSCUC to accredit Ashford.

56.     A WSCUC team visited Ashford in April 2013.

57.     On July 10, 2013, WSCUC granted Initial Accreditation to Ashford for five years, until July 15, 2018.  In granting accreditation to Ashford, the WSCUC was persuaded, in large part, by Ashford's purported reallocation of resources from marketing and enrollment to instruction and student services, reflected in changes implemented in late 2012, and reflected in Ashford's projected budget for 2013.  In fact, much of the 2013 visitation report issued by the WSCUC was focused on the apparent shift in spending from recruitment to academics:

B. Alignment of resource allocations with educational purposes and
objectives (CFR 3.5) In its July 3, 2012 letter, the Commission summarized
the previous team's observation as "…..historic spending patterns [show]
relatively high funding levels for recruitment compared to resources to
support academic quality and student services." In prior years, Ashford was
increasingly relying on continued growth in new enrollments in order to
generate revenue and profitability without the required focus on student
success. The current visiting team found that Ashford had strategically and
thoughtfully reallocated significant resources across the entire student life
cycle in order to positively impact student success. This was achieved
through an Ashford University specific collaborative budget process, re-
assignment of significant numbers of people from Bridgepoint to Ashford,
addition of numerous student support resources, large reductions and
reassignment of recruitment specific personnel, and the hiring of instruction
related personnel, including full-time faculty.

….

Ashford University has created a collaborative and inclusive budget process,
*which is driven by the Board of Trustees of the institution*. The process
focused on connecting resource allocation to the current strategic plan, which
called for the institution to drive these allocations around initiatives to
increase student success. The main factors of the resource allocation included
decreased class size, the Ashford Promise (discussed above), increased
numbers of full-time faculty, *dramatic reductions in the number of
Admission Counselors, increased student services personnel*, faculty
development funds, *reassignment of 156 key personnel from Bridgepoint to
Ashford*, and continued 19 investments in academic technology. *The results
of the re-allocation from fiscal year 2012 to fiscal year 2013 have been
dramatic, with over $120,000,000 in increased expenditures in
Instructional Costs and Services while Marketing and Promotional have
actually decreased during the same time period.*

…

**Resource Re-Allocation Results**
The vast majority of the changes made were completed in the second half of
2012 and as part of the 2013 budget. The results for 2012 can be seen on a
*pro forma* full year basis as if the changes were made January 1 (see Table
1). Also, the full effect of the reallocation is very clear in the fiscal year 2013
budget. Evidence presented to the team show the institution is tracking on an
actual basis very close to the 2013 budget; therefore, the changes have
proven to be valid. The *institution has focused its resources away from
marketing and recruiting and more towards student support, retention, and
instruction. Re-allocation started with the restructuring of the admissions
department. As noted previously, the number of Admissions Counselors,
combined with an increase of Student Advisors from 300 to 441 as of
March 31, 2013, reduced the advisor-to-student ratio from 300:1 to 200:1.*
Also, significantly more full-time online faculty members have been hired
bringing the total count up to 217 at the time of the visit. Throughout the
reorganization process the institution continued to hire additional personnel
to fill the needs of a more student focused organization including, 12 people
in Planning and Effectiveness and a total of 178 in academics (including the

additional full-time faculty). The total incremental hires were 231 through March 31, 2013 (for the period of January 1, 2012 through March 31, 2013).

…

***The student support expenditures continue to increase while the marketing and promotional decreased from 2012 to 2013.***

…

Overall, the Board of Trustees and leadership of Ashford are to be commended for their focusing of resources away from just acquiring students (marketing and recruitment) to the entire student life cycle. The changes in resource allocation are significant and clear in the evidence presented to the team. They will negatively impact the growth of enrollment, but will lead to increased retention, student outcomes, and the ability of the institution to remain financial sustainable (CFR 3.5).

(emphasis added).

58.     Ashford has since retained its WSCUC accreditation at all times since.

59.     The table below lists the expenses (in millions of dollars), and proportion of expenses reported by Bridgepoint[2] to be allocated to (a) admissions administration and marketing ("AAM"), (b) instruction and student services ("Instruction"), and (c) general and administrative expenses ("G&A"):

| Year | Total Expenses | AAM | | Instruction | | G&A | |
|------|----------------|---------|--------|---------|--------|--------|--------|
| 2010 | $496.8 | $211.6 | 42.58% | $187.4 | 37.72% | $97.9 | 19.70% |
| 2011 | $659.6 | $297.6 | 45.12% | $304.2 | 46.12% | $57.8 | 8.76% |
| 2012 | $772.7 | $339.2 | 43.90% | $364.0 | 47.11% | $69.5 | 8.99% |
| 2013 | $683.0 | $234.5 | 34.34% | $365.4 | 53.50% | $76.1 | 11.14% |
| 2014 | $624.4 | $231.1 | 37.02% | $315.1 | 50.46% | $61.4 | 9.83% |
| 2015 | $604.0 | $197.6 | 32.71% | $281.5 | 46.60% | $56.6 | 9.37% |

[2] As noted above, neither BPI nor Ashford releases stand-alone financial information pertaining to Ashford. And Ashford does not generate audited financial statements. Ashford does provided unaudited financial information to WSCUC, some of which is sporadically reflected in reports released by WSCUC. Since Ashford's enrollment generally accounts for 97% of BPI's total enrollment, BPI's figures should be substantially identical to those pertaining to Ashford.

In the first half of 2012 and earlier, Bridgepoint's and Ashford's AAM expenses were comparable to or higher than their Instruction expenses. But, between 2012 and 2013, Bridgepoint reported that its AAM expenses went from 44% of total expenses to 34%, and instruction went from 47% to 53% of expenses. In other words, in one year, the ratio of instructional to admissions/marketing expenses went from roughly even to 1.5:1. In 2014 and 2015, too, Bridgepoint reported that Instruction expenses were considerably higher than AAM expenses.

60. But Ashford misrepresented its expenses as a percent of its revenue that were properly attributable to instruction and student services as opposed to admissions and marketing.

61. A significant amount of labor costs were removed from Admissions and added to the Instruction and G&A categories.

62. Ashford accomplished this end, in large part, by restructuring and its admissions and advising staff and the allocation of their salaries.

63. In Ashford's "advising" of enrolled students, much of the focus is on students in the first three weeks of their first class. This relates to the implementation and effect of one of Ashford's key marketing points to prospective students (both graduate and undergraduate) -- the "Ashford Promise." Students are considered to be "conditionally" admitted until the Sunday of the third week of instruction (the "Ashford Promise Period"). If they are not meeting Ashford's "Basic Academic Requirements" (the "BAR" - a cumulative grade of C- or higher (69.5%) ), they are supposed to be involuntarily withdrawn from their course. Also, during this time period, they may voluntarily elect to withdraw, with all tuition refunded and no further obligation. Ashford advertises the Ashford Promise as " an opportunity to attend Ashford University risk-free and determine whether or not it is a good fit for [the student's] lifestyle and education goals."

64. Prior to 2012, Ashford employed (1) "Admissions Counselors "

("ACs")[3] to both advise prospective students during the application/enrollment process and also to advise new students during the Ashford Promise Period; and (2) Admissions Managers ("AMs") who supervised the ACs. During that time period, Ashford allocated the entire salaries of both the ACs and the AMs to the AAM expense category. The expenses were properly allocated in that category, because their responsibilities related to admissions and marketing. During that time period, Student Advising, a division within Student Services, performed advising functions for students who had completed the Ashford Promise Period. The expenses of Student Advising were allocated to G&A. rather than AAM or Instruction.

65. In 2012, Ashford created the new position of "University Advisor" ("UAs"). UAs would perform the function of advising students in the Ashford Promise Period, and ACs would thereafter only advise prospective students). UAs consisted of former AMs and certain more senior ACs.

66. Additionally, employees in Student Advising were required to indefinitely assign a team of 30 staff, 2 managers, a director were responsible for taking over job duties formerly performed by ACs – specifically, a team of 30 staff, 2 managers, a director were indefinitely assigned a team of 30 staff, 2 managers, a director were assigned to getting the students to progress through the Ashford Promise Period. This team was referred to as the "SWAT Team." Their work included making calls to students to encourage them to attend class. But Student Advising expenses continued to be allocated entirely to Instruction, and not to AAM, even though the bulk of the expenses on the SWAT Team should have been allocated to AAM.

67. An analysis performed by BPIs Business Process Improvement team showed nearly all the time of UAs, ACs, and the SWAT Team, was spent on recruiting new students. Since Admissions was already consistently missing their

---

[3] Starting with the 2015-16 academic year, the position of "Admissions Counselor" was renamed "Enrollment Services Advisor."

weekly enrollment targets and endured almost daily high-pressure update meetings with Bridgepoint and Ashford executives , a decision was made to bury the report.

68.     After mid-2012, Ashford subsequently allocated the *entirety* of UAs' salaries to Instruction. Although there were fewer UAs than ACs (approximately 45% UAs, 65% ACs), UAs were more highly compensated, and had a substantial impact on Ashford and BPI's expenses.

69.     After mid-2012, Ashford allocated portions of ACs' salaries to Instruction and G&A, and only a portion to AAM.

70.     The rationale behind these reallocations was that the Admissions Counselors and University Advisors have listed in their job description that they perform duties associated with student retention.

71.     But the Admissions Counselors and University Advisors play little role in providing assistance to students, and their functions have remained almost exclusively related to marketing and admissions.

72.     ACs' salaries should have been allocated almost entirely in Admissions since they performed an almost entirely admissions function. At least half of UAs' salaries should also have been allocated to AAM. The salaries of those Student Advising employees assigned to "push" students through the Ashford Promise Period should also have been assigned to AAM, but were not.

73.     If Ashford were to accurately allocate these costs where they belonged, the percentage of expenses spent on AAM would substantially exceed the percentage of expenses allocated to Instruction. This was certainly true during Relator's tenure with Ashford (from 2013-2015) and was likely true from the beginning of Ashford's history and is not consistent with what is reported in publically reported to the SEC, nor in what is provided to WSCUC.

74.     Ashford knowingly made the foregoing expense allocations and it was been openly discussed by senior officers of Ashford and Bridgepoint, including Jim Smith, Bridgepoint's Assistant Vice President, Finance, and Rodney T. Sheng,

Bridgepoint's Chief Administrative Officer. Sheng told the Relator not to pursue any changes that would impact the allocation of UA or AC salaries or responsibilities because it was something carefully conceived both (1) make it appear to WSCUC that Ashford was demonstrating a greater concern for continuing student success rather than focusing so heavily on new students, and (2) give Ashford and Bridgepoint more flexibility to reallocate expenses if and when they needed to.

**B. Fraudulent Procurement of Federal Loans for Graduate Study to Collect Undergraduate Tuition Balances**

75.    Ashford's own policies limit graduate school admission to those who have completed an undergraduate degree. As noted on Ashford's website, "[a]pplicants *seeking admission* to any Master's degree program must meet the following admission requirements prior to the start of the first course at Ashford... [h]ave a Bachelor's degree or post-graduate degree from a regionally accredited or approved nationally accredited college or university with a grade point average (GPA) of 2.0 or above" (emphasis added). Ashford Online Catalog, 2016-17, "Section Seven: Graduate Programs," accessed on September 11, 2016.

76.    But Ashford routinely admits students into its graduate programs who do not have a Bachelor's degree or post-graduate degree, and, accordingly, does not enforce its own "published standards" in contravention of the provisions of the HEA.

77.    Students presently enrolled as undergraduates at Ashford, but who have exhausted their undergraduate financial aid eligibility, are routinely encouraged to apply to graduate programs, and are admitted into graduate programs, in order to make graduate financial aid available to satisfy the students' unpaid *undergraduate* tuition balances.

78.    Students with substantial unpaid undergraduate tuition, but who have exhausted the lifetime limits on undergraduate borrowing, have little hope of

completing their degrees because virtually none of them have the means to pay out-of-pocket Ashford's (relatively high) tuition rates. And Ashford has little hope of collecting any further undergraduate tuition from them.

79. Ashford uses the proceeds of federal PLUS loans, ostensibly for graduate study, to enable it collect undergraduate tuition balances.

80. Very few students enrolled in graduate programs in these circumstances will ever make much academic progress towards a degree, and there is no serious intention for them to do so. Typically, they remained enrolled in graduate programs just long enough to collect a student stipend, and for Ashford to collect the remainder of the loan proceeds.

81. The aggressive recruitment/placement of Ashford undergraduates into its graduate programs is reflected in the fact that between 45-60% of Ashford graduate students are former AU undergrads. This is an extraordinarily high figure compared to comparable institutions.

82. This fraudulent practice is in violation of the HEA in several respects.

83. First, Ashford is failing to enforce its own published standards for graduate eligibility, in contravention of the requirements of the HEA. Ashford categorizes these students in its systems as an "Incomplete" which, by definition confirms that they are not graduates of the undergraduate program.

84. Second, it is contrary to the requirement that "[t]he school agree[] to use any funds it receives under any Title IV program solely for the purposes specified in and in accordance with that program." *See* 34 C.F.R. § 668.14(b)(1). Ashford is misallocating graduate PLUS loan funds ostensibly sought for graduate study to pay undergraduate tuition balances. Ashford is liable to the DOE for such improperly spent or funds under Title IV. *See* 34 C.F.R. § 668.14(b)(25).

85. The use of graduate loan funds to pay undergraduate debts has the additional impact of distorting Ashford's reported loan default and repayment rates. A student ostensibly enrolled in a graduate program, even one who has no hope of

1  progressing academically, will be in deferment status. As such, the student will be
2  counted, but will considered to be non-defaulting, in determining default rates, even
3  though s/he will not be making loan payments. But graduate students are not
4  considered at all in calculating repayment rates, so they do not adversely impact
5  those rates even though they are not repaying their loans. This is a way of
6  "gaming" default and repayment rates in a manner that distorts the reported default
7  and repayment rates of Ashford graduates.

8
9  **C. Ashford Systematically Engages in Coercive and Deceptive Advising of Prospective and Enrolled Students**

10     86.    As noted above, HEA prohibits participating schools from making
11  material misrepresentations to, inter alia, "a ***student or prospective student*** or any
12  member of the public..." 34 CFR § 668.71(c). Additionally, the HEA requires
13  participating schools to provide prospective students with "data concerning
14  employment statistics, graduation statistics, and any other information necessary to
15  substantiate the truthfulness of the advertisements." 20 U.S.C. § 1094(a)(8). As
16  described below, Ashford engages in deceptive practices designed (1) to cause
17  prospective students to enroll in academic programs to suit Ashford's financial
18  objectives regardless of the needs of the prospective student, and (2) to cause
19  students to remain enrolled during the three-week "Ashford Promise" trial period
20  even when Ashford's data (which it maintains for every student) shows that the
21  student, based on results up to that point in the course, cannot possibly pass the
22  course. In these cases students would be better off withdrawing and having
23  Ashford refund any tuition payments. Instead Ashford engages in highly active
24  campaigns using automated dialers, email, and calls from AC and UA personal cell
25  phones to urge and coerce students to make a post of any kind on the online
26  platform so as to trigger student attendance thereby making the student a revenue
27  generating student (and no longer "conditionally" enrolled) for Ashford.

28

### 1. Admissions Counselors' Arbitrary Steering of Prospective Students Into Arbitrary Academic Programs to Suit Ashford's Financial Objectives

87.     Prospective students may come to speak with Ashford's Admissions staff by contacting Ashford on their own initiative, or being directed to Ashford by various feeder websites (Ashford pays the proprietors of such websites for prospective sales leads).

88.     Ashford maintains four undergraduate programs with different degree requirements: (1) the Forbes School of Business, (2) the College of Education, (3) the College of Health, Human Services, and Science, and (4) the College of Liberal Arts. These programs have different graduation requirements requiring the completion of different courses.

89.     The majority (close to 65%) of prospective students that who come in contact with Admissions do not know what program they should or want to enroll in. Even those student prospects that selected a program of interest on a feeder website, prior to being connected with an Admissions Counselor did so in a majority of cases with the intent to get more information on the university and was required to choose from a menu of options before being allowed to continue through the website.

90.     Prospective students (leads) are routed to an arbitrarily designated admissions " team" affiliated with one of the four programs, on a rotational basis – e.g., business team one day, health and human services another day.

91.     Prospective students are pressured into enrolling into the program affiliated with the person answering the phone regardless of the student's interests or needs.

92.     ACs will only get credit for causing the enrollment if the student enrolls in the program with which the AC is affiliated, which motivates the AC to steer the student into that program.

93.     As a result of this practice, most prospective students are routed into the program with which the AC answering the telephone is affiliated. The AC will misrepresent that the (arbitrarily assigned) program is best for the student's needs, when that is usually not correct.

94.     A consequence of this practice is that approximately 40% of Ashford undergraduate students change programs at least one time. Changing programs, in turn, causes students to take more classes than they would otherwise need to, because not all classes are applicable to all programs. The student, therefore, ends up requiring additional federal loans and grants to cover additional courses.

95.     Ashford and BPI leadership are well aware of the process and the consequences. But there are two beneficial consequences for Ashford (1) it allows Ashford to steer prospective students into programs that are under enrolled, and (2) Ashford will be able to draw down more federal aid, and when the aid runs out, they can then "hold the degree hostage" until the student agrees to enroll into the graduate program and then use that aid to pay the outstanding debt in the undergraduate program to release the degree, as described above.

**2. Ashford Fails to Live Up to the "Ashford Promise"**

96.     As noted above,   students are considered to be "conditionally" admitted during the Ashford Promise Period, and  Ashford advertises the Ashford Promise as " an opportunity to attend Ashford University risk-free and determine whether or not it is a good fit for [the student's] lifestyle and education goals." But, in practice, this is not what occurs.

**a. The Ashford Promise Fails to Protect Graduate Students**

97.     The Ashford Promise does not include Academic Progress Controls for graduate students, unlike those that are in place for undergraduate students. Students with no chance of passing the course are encouraged to matriculate out of "conditional" admissions and into revenue generating status.

98.     Students enter believing they are provided with both the ability to

withdraw voluntarily *and* the academic evaluation (the BAR) to avoid the student from progressing onto the course as a revenue generating/ debt bearing student.

But the BAR is not implemented for graduate students.

99.     The failure to implement the BAR for graduate students renders Ashford's marketing practices misleading, in violation of 34 CFR § 668.71(c) and 20 U.S.C. § 1094(a)(8).

### b. Coercive Advising Practices are Designed to Dissuade Students from Withdrawing During the "Ashford Promise" Period

100.    During the Ashford Promise period, Ashford personnel, particularly its ACs and UAs, do everything possible to ensure that students do not voluntarily withdraw during the Ashford Promise period.

101.    A student will be deemed to have completed the Ashford Promise Period once the student has posted "attendance" of a class on or after the first day of the fourth week of instruction – which means the student has taken any action on the online platform (or virtual classroom) in order to result in the recording of attendance.

102.    To coerce students into continuing to attend, advisers would use the threat that the student would not earn the financial aid owed to them if the student stopped attending. This includes the portion of the financial aid that would be paid to the student as a cash stipend.

103.    Ashford would also send reminders to students, at or around the end of the Ashford Promise period, reminding them to log in and attend class. Admissions operates using an automatic dialer which calls students multiple times a day until the student submits and posts attendance, causing them to become revenue generating and debt bearing.

104.    Ashford would encourage continued attendance even when it was unlikely or impossible for the student to pass, or benefit from, the course.

105.    As a result, Ashford would benefit from the financial aid disbursement

associated with the student, resulting in millions of financial aid dollars being disbursed that should have been averted by stopping the student from progressing once it was determined that it was unlikely that they would pass the course by the third week.

106. For graduate students, in particular, for whom the BAR is not implemented, graduate students that are failing in course 1, weeks 1-3 to the degree that they are it is no longer possible pass the course (moreover, they must achieve a B in the first 3 courses to remain enrolled) are coerced by Admissions to continue to post attendance.

107. The coercive practices employed to dissuade students from withdrawing render the "Ashford Promise" misleading, in violation of 34 CFR § 668.71(c) and 20 U.S.C. § 1094(a)(8).

**D. Misrepresentations to Investors in 2014-15 Concerning Current and Prospective Enrollment**

108. In late 2014 and early 2015, Bridgepoint made material misrepresentations to the investing public concerning Ashford's actual and prospective enrollment, which the Defendants knew was declining, and would decline at an accelerated pace in 2015. These misrepresentations to the public, specifically to investors, were in violation of 34 CFR § 668.71(a).

**1. May-November 2014: Development and Initial Review of the 3UG Policy**

109. On May 2, 2014, the SEC informed Bridgepoint that a reassessment of its revenue recognition policy was necessary. Specifically, the SEC required Bridgepoint to reassess whether collectability is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with Bridgepoint's institutions upon certain changes in circumstances, such as when a student loses financial aid eligibility. On May 30, 2014, Bridgepoint filed a current report with the SEC on Form 8-K announcing that

Bridgepoint's management had determined that its financial statements filed with the SEC the years ended December 31, 2011 and December 31, 2012, as well as the financial statements issued for the quarters ended March 31, 2012, June 30, 2012 and September 30, 2012, should no longer be relied upon.

110. In mid-2014, Ashford developed a policy (the "Three Unsuccessful Grade Policy" or "3UG Policy") ostensibly designed to more accurately account for whether students remained eligible for financial aid sufficient to pay for their tuition. The policy was designed to at least make it appear that Bridgepoint was taking steps in response to the SEC's directives. The 3UG Policy would provide that students who had failed three consecutive courses would be dropped, and not permitted to re-enroll, after the conclusion of the third consecutive failed course. Internally, little or no enrollment or revenue impact was expected from the implementation of the 3UG Policy, because federal student aid is generally unavailable, in any event, to students who have failed three consecutive courses. The 3UG Policy was designed, in effect, to render the appearance of compliance with Commission directives without causing any adverse impact on revenues.

111. Before, during, and after the 3UG policy's implementation, multiple, independent analyses were performed by Ashford's Institutional Research team, Bridgepoint's Education's Data Analytics team (referred to as "DICE"), as well as by Plaintiff and members of his team. The analyses revealed that the policy would result in a reduction in overall student enrollment of approximately 8000-10000 more students than what was being presented in the 2015 financial plan.

112. Within a week after the initial analysis was conducted, Plaintiff brought the findings to Bridgepoint's senior management. He explained that the implementation of the 3UG policy would likely prompt a substantial increase in students being withdrawn by the University for failing to comply with the 3 UG standard. Plaintiff continued to articulate his concerns, over the next few months, sending various emails to Stephen Quattrociocchi (the COO at Ashford), Richard

Pattenaude (President), Jim Smith (VP of Finance), and other Ashford senior officers highlighting operational risks in meeting 2015 enrollment targets.

### 2. Q3 2013 Earnings Call

113.    On November 5, 2014, Andrew Clark (CEO), Dan Devine (CFO), and other Bridgepoint officers participated in a conference call in connection with the release of financial results for the quarter ending September 30, 2014.  Clark indicated that Bridgepoint was expecting new enrollments to be positive throughout 2014, and total enrollments to "turn positive" (i.e., start increasing) during the second half of 2015:

> [W]e anticipate new enrollments will be positive throughout next year, and total enrollments will turn positive in the second half of the year. We currently view 2014 earnings as the bottom. With these positive student outcomes and a continued focus on operational efficiencies, we are focused on improving our operating margins in 2015, and our longer-term goal of EBITDA margin remains in the mid-teens. Throughout 2015, we will continue to review our uses of our cash balances and auctions for enhancing shareholder value, including acquisitions that would meaningfully diversify Bridgepoint Education, share repurchases and other value-creating opportunities.

But the internal analyses pertaining to the 3UG Policy indicated that flat or improved enrollment for 2015 was not possible.  The foregoing guidance as to 2015 enrollments was not achievable at the time it was provided.  Since revenues booked in the recently concluded Q3 2014 were dependent upon achieving the forecasted retention (and concomitant collection of tuition revenues pertaining to those student) over the next year, those revenues were necessarily overstated.

### 3. Implementation of the 3UG Policy, the Q4 2014 Results and 2015 Budget

114.    In or around November 2014, during the fourth quarter of fiscal 2014, the 3UG Policy was implemented.  In the same time frame, in mid-December 2014, Plaintiff was reviewing Quattrociocchi's preliminary budget.  Plaintiff questioned Quattrociocchi's enrollment assumptions, which appeared to be unreasonably high, noting that 2014 (particularly Q1) enrollment figures were (historically) unusually high, and could not expected to be repeated in 2015.   Plaintiff and his team

1   developed several enrollment scenarios -- all scenarios resulted in declining
2   enrollment and lower collection of tuition.

3           115.  Plaintiff sent another email to Quattrociocchi in late December 2014
4   with a list of the budget's gaps, issues, and drivers behind the issues.
5   Quattrociocchi replied back that "it's a little late to be raising this." At an
6   "Operations Meeting" chaired by Quattrociocchi in December 2014, Plaintiff
7   explained that the biggest problem with the budget was that the 3 UG policy impact
8   was not accounted for at all – the budget assumed that historical trends would
9   continue without any impact from the policy.

10          116.  As projected, by December 2014, the actual number of students
11  withdrawing began to rise and ranged between 160 and 200+ per week. This meant
12  that if it did not come down, Ashford was facing somewhere between 8000 and
13  10,000 fewer students than budgeted. Even a risk proposed management plan was
14  devised and implemented, Ashford could only manage down the risk by about
15  1000.

16          117.  In December 2014 and early January 2015, Plaintiff and
17  Quattrociocchi had several confrontational meetings, both one-on-one and group
18  meetings, during which Plaintiff reiterated that actual and prospective headcount.
19  At one of his Operations Meetings, Quattrociocchi referred to Complainant's not
20  agreeing with his budget as a "career-limiting move," and expressed his irritation
21  by saying, "So you're just not going to sing kumbaya with us are you?"

22          118.  In January 2015, Plaintiff discussed ▮▮▮▮▮▮▮▮▮ with
23  Mark Johnson, Executive VP and Chief Compliance Officer at Bridgepoint, and
24  also had several email exchanges with him. ▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮he
27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■.■■

■ Diane Thompson (Senior VP, Secretary and General Counsel of Bridgepoint)

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

119.   But on February 19, 2015, Plaintiff was terminated by Ashford.  He was told by Pattenaude that he had "become a liability."  Plaintiff's prior performance evaluations were positive and there were no oral or written disciplinary actions given.  The Department over which he was responsible delivered record-breaking results, after being asked to increase goals 3 different times in order to compensate for losses in other departments.

**4. The Company's Q4 2014 Earnings and Conference Call**

120.   On March 10, 2015, approximately three weeks following Plaintiff's termination, Clark, Devine and other Bridgepoint officers participated in a conference call in connection with the release of financial results for the quarter ending December 31, 2014.  Clark indicated that Bridgepoint was expecting that total enrollments would be flat, or grow slightly, in 2015, which directly contradicted the information provided to him by Plaintiff:

> Overall in 2014, we saw a concrete evidence that our strategies, hard work and investments are paying off for students. Our efforts to improve student and educational quality have produced results and we attribute some of Ashford's strong inquiry and application flows to our brand recognition efforts. We associate both of these with higher quality students who retain longer and higher new enrollments at Ashford.
> We've also had good results with retention. Over each of the past three quarters, we have reported to you the annual retention of students who are active in the year ago quarter, or who have graduated during that time. Now, for the fourth quarter of 2014, I'm pleased to report that this statistic was again up very meaningfully, reaching 65.1% in the quarter, a significant improvement of 330 basis points over the 61.8% retention in the fourth quarter of 2013. The retention improvement throughout 2014 reflects the success of the student preparedness and quality initiatives we have implemented.

> **Based upon what we've experienced in 2014 and our priorities for 2015, we anticipate new enrollments will show modest positive growth in 2015. We expect total enrollments throughout 2015 will be approximately flat compared to ending enrollments in 2014.** This means that average total enrollments for 2015 will be lower than average total enrollments in 2014, which will result in lower revenue for 2015. We anticipate that this decline in revenue will be fully offset by lower expenses resulting from the cost adjustments we made in 2014 and lower average new enrollments throughout 2015. (emphasis added)

As noted above, with respect to Q3 2014, the internal analyses pertaining to the 3UG Policy, as well as the known control gap relating to financial aid availability of incoming students, indicated that flat or improved enrollment for 2015 was not possible. The foregoing guidance as to 2015 enrollments was not achievable at the time it was provided. Since revenues booked in the recently concluded Q4 2014 were dependent upon achieving the forecasted retention (and concomitant collection of tuition revenues pertaining to those student) over the next year, those revenues were necessarily overstated.

### 6. Actual Results in 2015

121.    In the quarters ending March 31, 2015 (results announced May 5, 2015) and June 30, 2015 (results announced August 5, 2015), Bridgepoint announced further declines in total enrollment to 55,823 and 51,049 students, respectively, and continued year-over-year declines in quarterly revenues and income. The enrollment declines are in line with the internal estimates performed by Plaintiff and others at Ashford between July 2014 and February 2015.

### THE SUBMISSION OF FALSE CLAIMS

122.    Every request for a federal grant or Federal Direct Loan or federally guaranteed loan made on behalf of a student at Ashford constitutes a separate false claim.

123.    Each award and each government repayment of loan interest or defaulted loan principal was caused by Defendants' false certifications and statements in the PPAs, compliance audit Management Assertions, G5 Certifications, MPNs, School Certifications, and other documents, that Ashford was

1    in compliance with the requirements of the HEA and was therefore eligible to
2    receive Title IV funding. Defendants made these false certifications and statements
3    despite the fact that they had actual knowledge of their falsity. Each request for
4    payment constitutes a false claim under the FCA.

5    124.    The aid awards were caused by Ashford's false statements and
6    fraudulent promises in Ashford's PPAs that it would comply with applicable laws
7    and regulations governing the award of federal financial aid, and/or the false
8    representations in each grant and loan application that the student seeking federal
9    government aid was eligible to receive Title IV funding under the HEA. Ashford's
10   conduct was knowing and material to the DOE's disbursement of funds to Ashford.
11   Each request for payment thus constitutes a false claim under the FCA. Between
12   Calendar Years 2010 and 2016, DOE disbursed approximately $3.8 billion in Title
13   IV funds for Ashford students. Those loans to Ashford students who Ashford
14   caused to lie on their Financial Aid applications at a time Defendants certified
15   Ashford was in compliance with federal regulations, were fraudulent.

16                                    **COUNT I**
                      **False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B).**
17
       125.    The foregoing paragraphs are hereby incorporated by reference.
18
       126.    This is a claim for treble damages and penalties under the False Claims
19
     Act, 31 U.S.C. § 3729, *et seq.*, as amended.
20
       127.    By virtue of the acts described above, Defendants, in reckless
21
     disregard or deliberate ignorance for the truth or falsity of the information involved,
22
     or with actual knowledge of the falsity of the information, knowingly presented, or
23
     caused to be presented, and continue to present or cause to be presented, false or
24
     fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729
25
     (a)(1)(A).
26
       128.    By virtue of the acts described above, Defendants, in reckless
27
     disregard or deliberate ignorance for the truth or falsity of the information involved,
28

or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and continue to knowingly make, use or cause to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims, in violation of 31 U.S.C. § 3729 (a)(1)(B).

129. Each claim (including each invoice) Defendants submitted for payment constituted a false claim and a false record or statement to get false or fraudulent claims paid by the government.

130. Relator cannot at this time identify all of the false claims that were caused by Defendants' conduct. Documentation of such claims is in the possession of the government and the Defendants, and Relator has no access to such records.

131. The government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid the claims that would not have been paid but for Defendants' illegal conduct.

132. By reason of Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq*,

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States have sustained because of Defendants' actions, plus interest and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 ,

3.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

4.    That the United States and Relator recover such other relief as the

1   Court deems just and proper

2           RELATOR HEREBY DEMANDS TRIAL BY JURY.

3   Dated:  January 30, 2017                CUNEO GILBERT & LADUCA,LLP

4

5                                           By:

6
                                            Michael J. Flannery (SB No. 196266)
7                                           7733 Forsyth Boulevard, Suite 1675
                                            Clayton, MO 63105
8                                           Telephone:  (202) 789-3960

9                                           CUNEO GILBERT & LADUCA LLP
                                            Charles J. LaDuca
10                                          Matthew E. Miller, will seek admission *pro*
                                            *hac vice*
11                                          charlesl@cuneolaw.com,
                                            mmiller@cuneolaw.com
12                                          4725 Wisconsin Ave., NW, Suite 200
                                            Washington, DC 20016
13                                          Telephone: (202) 789-3960

14
                                            *Attorneys for Plaintiff*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORRECTED COMPLAINT                  - 34 -